# In The United States District Court
# For the Eastern District of Wisconsin

**Joel Hjortness**, a minor,      :

by and through his Parents      :     Case No.  **0 5 - C - 6 4 8**

and legal guardians, **Eric** and   :

**Gail Hjortness**               :     Judge         SOFRON B. NEDILSC

1965 Oakview Drive         :        GRIESBACH   CLERK

Neenah, Wisconsin          :

                            :     **COMPLAINT and**

           Plaintiffs,     :     **20 U.S.C. Section 1415(E)(2)**

                            :     **DE NOVO REVIEW**

v.                     :

                            :

**Neenah Joint School District**  :

410 South Commercial Street   :

Neenah, Wisconsin          :

                            :

          Defendant.     :

## Preliminary Statement

While the Parents were largely successful in the proceedings before the Administrative Law Judge, the relief afforded them was insufficient and contrary to law.

1. This action arises under the **Individuals with Disabilities and Education Act [IDEA]** and contemplates a *de novo* review of the state administrative agencies' decision pursuant to **20 U.S.C. Section 1415**.

2. Congress recently recognized that "the implementation of this title has been impeded by low expectations, and insufficient focus on applying replicable research on proven methods of teaching and learning for children

1

with disabilities." **2005 Amendments, Subpart 4 General Provisions, Findings of Congress Section ( c )(4).**

3. **20 U.S.C. Section 1401(18)** provides that special education is to be "provided in conformity with the individualized education program [**IEP**] required under section **1415(a)(5)** of this title."

4. The IEP must encapsulate a program that offers the child a **Free Appropriate Public Education [FAPE]** as defined by the Act and interpreted by the Courts.

5. The specific content requirements for the IEP are delineated in **34 C.F.R. Section 300.346**. As relevant here, an IEP *must* include *measurable* annual goals and short term objectives.

6. **IDEA** imposes extensive procedural protections for parents of handicapped children including their right to request a due process hearing before an impartial hearing officer to determine whether the local school district has fulfilled its obligations under the Act. **20 U.S.C. Section 1415(b)(2).**

7. *Meaningful* Parent participation in the IEP process is guaranteed to Parents under the Act.

8. Any party dissatisfied with the decision rendered in the state

2

administrative proceedings is an aggrieved party under the Act and may bring an action in federal court. **20 U.S.C. Section 1415(e).**

## Jurisdiction

9. Jurisdiction is conferred on this Court by **20 U.S.C. Section 1415** which provides this Court with jurisdiction over any action brought pursuant to this section without regard to the amount in controversy.

10. Jurisdiction is also conferred on this Court by **28 U.S.C. Section 1331** which authorizes federal courts to adjudicate disputes arising under the Constitution and the laws of the United States.

11. Declaratory relief is sought pursuant to **28 U.S.C. 2201** and **2202.**

## Parties

12. The Plaintiffs, Eric and Gail Hjortness are the Parents and legal guardians of their son, Plaintiff, Joel Hjortness, all who reside within the State of Wisconsin and more specifically in the Neenah Joint School District in Neenah, Wisconsin.

13. Joel Hjortness is a child with a disability as defined by the **Individuals with Disabilities and Education Act [IDEA]. 20 U.S.C. Section 1400 et. seq.** now **20 U.S.C. Section 601 et. seq.**

14. The Defendant, Neenah Joint School District is located in Neenah, Wisconsin and is charged with the responsibility of providing a

3

**Free Appropriate Public Education** to all school aged children residing within its boundaries including children with disabilities as defined by **IDEA**.

15. Defendant school district is a recipient of federal funding under **20 U.S.C. Section 1400 et seq**. and as a consequence is charged with fulfilling its obligations under **IDEA**.

**Claims for Relief**

16. Joel Hjortness was encountering more and more difficulty in participating successfully as a student under the IEP created by the Defendant school district.

17. Frustrated by their son's seriously declining progress, in the late winter, early spring of 2004, the Parents sought, through the IEP process, to have Defendant school consider placement at a private school that had a proven success history with students such as their son.

18. The Defendant refused *to consider* the Parents' request.

19. The Parents unilaterally placed their son in the private school and filed a due process hearing on or about June 18, 2004, alleging, among other things, that the Defendant failed to offer their son a **Free Appropriate Public Education** and requested reimbursement for the costs associated with their unilateral private placement.

4

20. A hearing was conducted on January 11, 12, 13 and 14, 2005 and concluded on February 23, 2005. The Administrative Law Judge determined that Defendant had in fact denied this student a **Free Appropriate Public Education**. Furthermore, the hearing officer determined that the Parents' unilateral private placement *was an appropriate placement* for Joel. That decision is attached hereto as Plaintiffs' Exhibit 1.

21. The hearing officer refused, however, without any legally recognized explanation, to grant full reimbursement to the Parents, granting partial relief only.

22. The Parents are aggrieved parties under the Act.

Wherefore, the Parents respectfully request this Court enter Judgment on the Administrative record in their behalf, declaring that:

1. **IDEA** requires meaningful Parent participation and the denial of this right to the Parents is a denial of a **Free Appropriate Public Education**.

2. The Defendant denied these Parents meaningful participation in the IEP process and in so doing violated their obligations under **IDEA**.

3. The IEP was procedurally and substantively flawed denying this student a **Free Appropriate Public Education**.

4. The Parents' private placement was an appropriate placement.

5

5. The Parents are entitled to *all* the costs *reasonably* associated with placing their child at the private school.

6. The Parents are entitled to the costs incurred in the underlying action as well as those incurred in perfecting this action, including reasonable attorney fees in perfecting this claim in this Court.

7. Such other equitable relief as this Court deems just and appropriate.

Respectfully Submitted,

David J. Winkel
36 Jewelers Park Drive, Suite 202
Neenah, Wisconsin 54956
(920) 725-8887
(920) 725-9077 fax
Winkellawoffice@sbcglobal.net

and

Stephen Walker
Ohio Reg. No. 0031032
23245 Fairmount Blvd.
Beachwood, Ohio 44122
(216) 360-9200
(216) 360-9209 fax
StphnWalkerAtty@aol.com

6



**Before The**
**State Of Wisconsin**
**DIVISION OF HEARINGS AND APPEALS**

In the Matter of the Due Process Hearing on behalf
of Joel Hjortness, by and through his Parents, Eric
and Gail Hjortness,

                          **Petitioners**

                                                      Case No.: LEA-04-019

and

Neenah Joint School District,

                          **Respondent**

### DECISION

       The Parties to this proceeding are as follows:

Joel Hjortness, by
    Eric and Gail Hjortness
    1965 Oakview Drive
    Neenah, Wisconsin 54956,
  with assistance from,

    Stephen Walker
    23245 Fairmont Blvd.
    Beechwood, Ohio 44122

Neenah Joint School District, by
    Attorney Lori Lubinsky
    Axley Brynelson LLP
    P.O. Box 1767
    Madison, Wisconsin 53701-1767

       On June 18, 2004, the Department of Public Instruction received a request for a due process hearing under Subchapter V, Chapter 115, Wis. Stats., and the federal Individuals with Disabilities Education Act (IDEA), by Eric and Gail Hjortness (the "Parents") on behalf their son, Joel Hjortness (the "Student"). The Parents asked that the Neenah Joint School District (the "District") either provide a free appropriate public education ("FAPE") for the Student "or to pay the costs of placement at Sonia Shankman Orthogenic School, including the costs of transportation."

       The due process hearing was originally scheduled to commence on August 30, 2004, but the hearing dates were vacated at the request of the Parents, and without objection by District, as the Parents sought review of the order of the Division of Hearings and Appeals (the "Division") dated July 21, 2004 that denied a motion to permit out of state counsel, Mr. Stephen Walker, to appear in these proceedings *pro hac vice* as counsel

EXHIBIT

tabbies®

/

for the Parents. In the order of July 21, 2004, the Division noted that the denial of the application "would not preclude Mr. Walker from accompanying and advising the [Parents] at the due process hearing in the capacity of an individual 'with special knowledge or training with respect to problems of children with disabilities'," as permitted by Wis. Stat. § 115.80(3), 20 U.S.C. § 1415(h)(1), and 34 C.F.R. § 300.509(a(1). In a scheduling order dated September 9, 2004, further scheduling of the hearing continued to be deferred until November 12, 2004, to allow counsel for the Parents to continue seeking review of the July 21, 2004 order.

By scheduling order dated November 12, 2004, the Division scheduled the due process hearing to commence on January 11, 2005, and reiterated that Mr. Walker could appear in the proceedings to assist the Parents in the capacity of a person "with special knowledge or training with respect to problems of children with disabilities." The hearing was held in the offices of the District on January 11, 12, 13, and 14, 2005. The hearing was continued at the offices of the District on February 23, 2005, and concluded with a telephone conference on the record on February 24, 2005, with counsel for the District and Mr. Walker participating throughout the hearing. Pursuant to an agreed briefing schedule, the Parties filed and served simultaneous principal and responsive posthearing briefs, with the responsive briefs being filed on April 8, 2005.

The issues identified for the due process hearing were specified in a statement of issues filed on behalf of the Parents, which when viewed in context with the evidence adduced at the due process hearing and the arguments advanced in support of relief in the post-hearing briefs filed on behalf of the Parents, are restated as follows:

1. Whether the IEP team that developed the 2004-2005 IEP was improperly constituted because it lacked a representative from the Student's existing school (the Sonia Shankman Orthogenic School). (Enumerated issue 6).

2. Whether the 2004-2005 IEP is inappropriate because the District had failed to adequately identify the Student's disabilities and his resultant needs. (Enumerated issues 1 and 4).

3. Whether the 2004-2005 IEP and placement was procedurally deficient because the short term objectives for the 2004-2005 IEP were crafted after the IEP team had met and had determined that the appropriate placement would be in the District schools. (Enumerated issue 1).

4. Whether the District's placement decision under the 2004-2005 IEP was procedurally deficient because the IEP team refused to consider the Parent's desired placement at the Sonia Shankman Orthogenic School as an appropriate placement. (Enumerated issue 6).

5.  Whether the 2004-2005 IEP and offer of placement failed to provide the Parents with sufficient prior written notice of the District's actions. (Enumerated issue 2).

6.  Whether the 2004-2005 IEP was substantively inappropriate because it lacked (a) sufficient present levels of educational performance, (b) sufficient or appropriate goals and short term objectives, (c) adequate related and support services, including an adequate behavioral intervention plan, and (d) physical education or adaptive physical education. (Enumerated issues 1, 3 and 5).

For the reasons set forth below, the request for reimbursement the expenses of the Parents' private school placement at Sonia Shankman Orthogenic School is granted in part.

## **Findings of Fact**

### *Background*

1.  Eric and Gail Hjortness (the "Parents") are the parents of Joel Hjortness (the "Student"), whose date of birth is August 27, 1990. The Parents reside in the area served by Neenah Joint School District (the "District"). The Student had attended public schools in the District until he was withdrawn by his Parents in May 2003. The Parents enrolled him in the Kennan Academy, located in the Menasha area, in May 2003, where he continued to receive his education until January 2004, when the Parents enrolled him as a resident student at Sonia Shankman Orthogenic School ("SSOS") in Chicago, Illinois, where to date he has continued to receive his education.

2.  Before he was withdrawn from the District schools in May 2003, the Student's placement under an IEP for the 2002-2003 school year had been in the District schools at Shattuck Middle School, where he was involved full-time in the general curriculum for the seventh grade. The Student had received educational services wholly in the regular education classroom, and had maintained B+ to A level work in his core classes, though inconsistency in his speed and organization of work has sometimes prevented him from consistently performing at above-average levels in daily contexts. The Parents withdrew him from the District schools principally because they believed the District was not appropriately addressing the Student's behaviors that were manifestations of his disabilities.

3.  The Student has disabilities that manifest themselves in a wide range of problem behaviors that interfere with his learning and the learning of others. The Student has been diagnosed at various times with a number of different disorders, specifically, obsessive compulsive disorder, Tourette's disorder, attention deficit/hyperactivity disorder, autistic spectrum disorder, oppositional defiant disorder, and anxiety disorder. In August 2003, an examining psychiatrist described him to be "a child with a complex neuropsychiatric disturbance that compromises his ability to self regulate his attention and concentration, suppress irrelevant perseverance ideation and to defuse and divert antisocial/inappropriate

impulses." (Ex. 509, p. 1022). An educator who was involved in his education at the Kennan Academy where he was educated for latter half of 2003 described him to have "significant deficits in the area of social communication." *Id.*

4. In May 2003 the Parents filed a due process hearing request that challenged in part the appropriateness of an IEP designed for the period May 23, 2003 to May 22, 2004, and wherein their principle request was for reimbursement for private school tuition for the 2003-2004 school year. In a decision dated November 3, 2003, the Division of Hearings and Appeals determined the IEP to provide a free appropriate public education and denied the request for tuition reimbursement. Division of Hearings and Appeals, Case No. LEA-03-019.

### *Three-Year Reevaluation in 2004*

5. By letter to the Parents dated November 13, 2003, the District offered to complete a three-year reevaluation of the Student, as required by law. Following a series of communications, the Parents accepted the offer for reevaluation. The District sent the Parents a formal written notice of reevaluation dated December 23, 2003, which had the effect of triggering a 90-day statutory period in which to complete the reevaluation.

6. The District scheduled an IEP team meeting for January 14, 2004, to discuss the proposed testing, but the meeting was canceled at the Parents' request so that they could arrange for the participation of certain medical and educational professionals to participate either in person or by telephone. The District asked that the Parents contact the District as soon as possible to reschedule the meeting.

7. The Parents did not contact the District to reschedule the January 14, 2004, meeting, so the evaluation team proceeded to determine what additional testing of the Student would be necessary. By letter dated January 29, 2004, the case manager for the Student's reevaluation provided the Parents with a summary of the types of assessment techniques recommended by the evaluation team. The case manager invited the Parents' response to the proposed plan and asked for suggestions to the plan. The case manager also outlined the meetings the Parents could expect to occur as a result of the three-year reevaluation process. After receiving this letter, the Parents requested a meeting to discuss the proposed testing. The District then scheduled a meeting for February 26, 2004, to "review existing information and determine [the] need for additional tests or other evaluation materials." This meeting was held as scheduled, though the Parents did not bring with them any of the experts or professionals they had indicated earlier that they had wanted to attend, which was the reason for canceling the original January 14th meeting.

8. In the meeting on February 26, 2004, the team identified the proposed testing to be conducted. The team decided to assess whether the Student continued to meet the educational criteria for other health impaired ("OHI"), as well as whether he met the educational criteria for autism and emotional behavior disabilities ("EBD"), though the

Parents did not concur in the need to assess for EBD. The team determined further to send team members to the Sonia Shankman Orthogenic School ("SSOS") in Chicago to conduct observations, meet with the Student, and obtain information from SSOS as part of the reevaluation.

9. The District was required by law to complete the reevaluation by March 18, 2004. The District had asked the Parents to allow the District an extension of time in which to complete the reevaluation, but the Parents did not agree to an extension. The District then requested that the Department of Public Instruction grant the District an additional 90 days to complete the reevaluation. By letter dated March 11, 2004, the DPI granted an extension of 45 days, to May 3, 2004.

10. The SSOS is a coeducational residential treatment program for children in need of support for behavioral and emotional issues. Its self-described primary mission is to provide "intensive milieu therapy for students with disturbed emotions who are in residential care at the school." (Exhibit A-1, p.4). Its academic program employs small class sizes taught by certified special education teachers. In the residence, the students live in dormitories, in dorm groups of up to seven students, during which at least one counselor is present at all times.

11. On March 12, 2004, three members of the IEP team (a school psychologist, an occupational therapist, and an autism resource teacher) visited SSOS to observe the Student and to collect information. Two of them observed the Student in a science class, and afterward the teacher of the class told them that the Student's behavior in class was fairly typical. Team members attempted to speak with the Student individually at separate times but the Student ignored or was largely non-communicative with them.

12. The District's autism resource teacher provided an SSOS teacher and a residence counselor with a survey for the Asperger Syndrome Diagnostic Scale, and provided the residence counselor with a survey for the Australia Scale for Asperger Syndrome, which they completed for the District. (The Parents completed the same surveys at the District's request.) The survey results reflected difficulties with social participation, communication skills, thinking differences, and behavioral expectations.

13. The District team formally interviewed a social worker, an administrator who supervised the Student's residential life, one of his classroom teachers, and a school administrator. These SSOS staff members reported the following information:

    a. The Student resents a number of the standard rules in the dorm.

    b. The Student is expected to follow a few very basic rules in the classroom setting, but requires frequent reminders about these rules. Violations of these rules occur both when the Student is under stress and also when tension appears minimal.

c. The Student needs a predicable routine in his schedule and is more likely to exhibit behavioral problems when unexpected events are included in his day.

d. The Student is confused and unskilled in social dynamics, rather than intending to promote conflict. He fails to recognize social cues in others, uses inflammatory, judgmental, or intolerant language, and tends not to be forgiving of others. He exhibits rigidity in thinking during conflicts, and finds it difficult to consider alternative views about an issue, often demanding that others adopt his views and beliefs.

e. The SSOS staff have had to develop a relationship with the Student before he becomes responsive to their directions.

f. When the Student has his most explosive behavior reactions in the dorm, he calms most successfully when he is directed to spend quiet time alone, where he can regroup and then later return to his peers.

g. The Student has difficulty finding appropriate responses to others when he perceives them to have done something to provoke him.

14. The reevaluation meeting was held on March 17, 2004. Among the conclusions of some of the IEP participants who prepared reports for the meeting were: triggers to unwanted behaviors included "excitement, competitive situations, transitions, stress, frustration, feelings of inadequacy and believing his needs are not being met" (Ex. 509, p. 1041); that interventions that have been successful included providing him 'safe place' to go, redirecting his attention, defusing tension with humor, use of positive statements, providing choices, walking when agitated, compromise, ignoring minor disruptive behavior, and foreshadowing transitions (id.); the Student "has profited from immediate feedback when target and off-target behaviors appear" with "feedback that specifically describes the positive and negative behaviors in the most objective and measurable ways" (Ex. 509, p. 1039); that "educational programming continue to focus on shaping the behavioral skills which he needs to participate effectively and positively in instruction" and that "other essential components of his education include methods of preventing behavioral outbursts, and facilitating de-escalation at times when outbursts do occur" (Ex. 509, p. 1045); and that "an active, large and quickly paced classroom may not be an appropriate fit" because "in these situations he has fallen behind and becomes frustrated," so that consequently the Student "may need individual and small group instruction to enhance learning opportunities and experience success" (Ex. 509, p. 1039).

15. The reevaluation team determined that the Student met the special educational criteria for autism and other health impairment (OHI). The team had before it information that included past diagnoses of obsessive compulsive disorder (OCD), Tourette's disorder, attention deficit hyperactivity disorder (ADHD), autistic spectrum disorder, oppositional defiant disorder (ODD), and depressive disorder, though the various diagnoses and evaluations reflected diverse conclusions as to the disorders present.

16. The consensus of the reevaluation team was that the Student also met the educational criteria for emotional behavioral disability (EBD). The Parents voiced strong disagreement with this conclusion, and as a result, the District chose not to identify EBD as an additional disability despite its conclusion to the contrary.

17. The District and the Parents both describe the Student's needs as being in the area of social skills. He exhibits a wide range of symptoms that reflect serious and chronic problems in social contexts. Problem areas include overstepping physical and social boundaries, acknowledging and following direct and indirect requests, noticing and accurately interpreting nonverbal cues/body language, using an appropriate tone of voice, frustration tolerance, interruptions, self-evaluation, recognizing the impact of his behavior on others or the consequences of that behavior, and conduct in competitive situations. He engages in frequent demanding, argumentative, stubborn, and angry behaviors. In the realm of "attention problems," he displays episodes of impulsivity, inattention, and poor concentration. These problem behaviors have led to frequent conflicts with others at school and adversely affect his involvement in the general curriculum.

## April 22, 2004 IEP Team Meeting

18. On March 19, 2004 the District identified four potential dates for the IEP team meeting to prepare an IEP and to determine placement. The District recognized that there were other persons that the Parents wished to invite to the meeting, but alerted the Parents that if these persons could not attend or otherwise participate directly, then the team could receive their written comments for consideration. The Student's mother responded that a representative from SSOS had indicated an interest in participating by telephone, and that she was coordinating with the representative to determine her availability on any of the four proposed dates. The Student's mother advised further that if the representative was unable to participate by telephone, then the representative might submit written materials for consideration of the team.

19. By letter dated March 24, 2004, the Parents advised the District that staff from SSOS would not be able to participate in the meeting by telephone on the dates proposed. The Parents also informed the District that SSOS would be conducting "autism evaluations this up coming month," which the Parents wished the IEP team to consider, and requested that the District postpone the IEP team meeting until those evaluations were completed. The Parents concluded that if the District chose not to wait for these expected evaluations from the SSOS, then they would be available to attend an IEP meeting on April 22, 2004. The Parents did not request that an alternative date for the meeting be identified that would enable an SSOS staff member to participate by telephone. The District proceeded and scheduled the IEP team meeting for April 22, 2004.

20. The autism evaluations that the Parents had understood the SSOS was to complete, were not completed until after October 2004, and the District did not receive a copy of the resulting report until December 2004.

21. The IEP team meeting convened on April 22, 2004. The Student's mother attended and was accompanied by her attorney. The team included the District's special education director, one regular education teacher each from Neenah High School (NHS) and Shattuck Middle School (SMS), one special education teacher each from NHS and SMS, one guidance counselor each from SMS and NHS, an OHI consultant from CESA 6 district, and the three District staff members who had visited SSOS the month before (school psychologist, the autism resource staff member who is also a speech language pathologist, and an occupational therapist).

22. The special education director served as the LEA Representative and led the discussion at the meeting. The Student's mother made an audio recording of the IEP team meeting. This recording is of record as District Exhibit C. The recording is approximately two hours and twelve minutes in length, but does not capture the final 10 to 15 minutes of the meeting. The unrecorded part of the IEP team meeting was in the nature of summation and did not address matters not substantially discussed earlier in the IEP meeting.

23. At the outset of the IEP meeting, the LEA representative stated that the discussion would not be guided by the existing IEP, but rather that the team would start "from scratch."

24. Discussion of specifying annual goals was largely in general terms only. The only specific goal discussed that was later incorporated into the IEP involved usage of appropriate hand raising techniques.

25. Likewise, no specific short term objectives were identified at the IEP meeting, though the extended discussion and the information before the team provided information from which to develop appropriate short term objectives.

26. The final phase of the meeting involved determining the appropriate placement for the Student. At the time of this discussion, specific goals had largely not yet been articulated, and no short term objectives had been crafted.

27. The consensus of the team, including the Student's mother, was that the Student required instruction in a small group setting, though the class size was not defined at the meeting. The LEA Representative expressed the view that the team had enough information to make a placement offer for the 2004-2005 school year at Neenah High School "with modifications in the curriculum." (Ex. C, Disc 2, track 9). The LEA Representative explained that the Student could receive instruction from special education teachers teaching the core subjects in a small group setting with regular education students. (Ex. C, Disc 2, track 10). The LEA Representative characterized this setting not to be a "regular education setting." (*Id.*). After further discussion regarding whether the District had the resources to construct the described small group classes with regular education students at NHS, the LEA Representative assessed the consensus of the District personnel on the team to be in the affirmative. (Ex. C, Disc 2, Track 11). The LEA Representative

noted that the goal over time would be to move away from this small group setting to a "regular education setting if not all of the time, most of the time," (id.), but that at the outset the District would place the Student in a small group setting 100% of the day for his core subjects. (Ex. C, Disc 2, Tracks 12-13).

28. The Student's mother asserted that the Student required class sizes of no more than three or four other students. The LEA Representative declined to quantify what the size of the classes would be in the "small group setting" in describing the placement offer at the IEP meeting. (Ex. C, Disc 2, Track 13). The Student's mother demurred, stating that she would not be able to determine whether the placement offer was appropriate if the offer did not include an approximate class size. The LEA Representative advised the Student's mother that the offer of placement would be "at NHS with classes based on his needs in terms of the ninth grade ... [in the] general curriculum," and that the District "will at this point say it would be special education I believe 100% of the time." (Ex. C, Disc 2, Track 13). The LEA Representative polled the other IEP team members as to whether they agreed that the appropriate placement would be at NHS "with modifications to the curriculum as the setting and that that would be the least restrictive at this point." (Id.). The Student's mother disagreed, while the District staff on the IEP team agreed, with the added comment that there would be direct instruction outside the general curriculum in behavioral strategies and monitoring of the Student's progress. (Id.). The Student's mother agreed that the Student required direct instruction in social skills outside the general curriculum. (Ex. C, Disc 1, Track 13).

29. During the IEP team meeting, the Student's mother asked that the District consider SSOS as a placement, and went so far as to define the ultimate issue for the IEP team to be whether the District would pay for the Student to be at SSOS under the IEP being developed. The LEA Representative dismissed this as an appropriate consideration for the meeting, unless it were first determined that IEP could not be implemented in the District schools. Because the IEP team determined that the IEP could be implemented at in the District schools, SSOS was not considered as a possible placement for implementation of the IEP. The LEA representative later stated that having determined that the IEP could be implemented in the District schools, there were no other options to consider. (Ex. C, Disc 2, Track 14).

30. In challenging the placement determination, the Student's mother asserted also that the Student required extended school year (ESY) services. She asserted that the Student requires remediation in social skills that require attention "all year long, every day of the year," and that she expected him to regress without ESY services in social skills. (Ex. C, Disc 2, Track 12). The District did not consider ESY services for the summer of 2004, but indicated that it was willing to revisit the issue upon receiving additional baseline information about the Student that SSOS was expected to provide at some undetermined later date. (Id.).

31. At the close of the IEP meeting, the LEA Representative informed the Student's mother that the District would prepare the IEP and formal placement offer and send it to them by May 3, 2004, which the District understood to be their deadline under the extension for conducting the reevaluation that had been granted by the DPI.

32. A preponderance of the evidence establishes that the District entered the IEP meeting having predetermined that the placement of the Student under the IEP to be developed at the meeting would be in the District schools.

### IEP for May 2004 to May 2005

33. After the IEP meeting, some District staff members of the team prepared the IEP for the period May 17, 2004 to May 16, 2005. The IEP specified the following four goals: (a) "[Student] will demonstrate appropriate hand raising procedures 5/10 times in a class," (b) [Student] will increase his ability to follow directions given by authority figures to 50% as measured by teacher monitoring system," (c) [Student] will increase his ability to interpret a situation and respond appropriately in 50% of situations as measured by a monitoring system," and (d) "[Student] will increase his ability to respond appropriately when in competitive situations, 50% of interactions, as measured by staff monitoring system." Of these four goals, only the first was explicitly discussed at the IEP meeting. The remaining three goals are identical to the goals in the 2003-2004 IEP, except that the percentages specified in these three remaining goals were lower than the percentages identified in the preceding IEP.

34. The short term objectives in support of each goal were not specifically discussed or crafted at the IEP meeting. The IEP contains three short term objectives for the "hand raising" goal, two of which are substantially identical to the short term objectives that supported a similar goal in the preceding IEP. Of the five supporting short term objectives for the second goal, four are substantially identical to the corresponding short term objectives in support of the corresponding goal in the preceding IEP, except that the percentages of the expected conduct are lower than those in the preceding IEP. Of the eight short term objectives supporting the third goal, five are substantially identical to the corresponding short term objectives in support of the corresponding goal in the prior IEP, and the remaining three short term objectives are variants of other short term objectives in the preceding IEP. Of the three supporting short term objectives in support of the fourth goal, all are substantially identical to the corresponding short term objectives in support of the corresponding goal in the preceding IEP.

35. At the IEP meeting, the District did not declare or give any indication that the goals and objectives in the IEP being developed would be substantially the same as the goals and objectives contained in the preceding IEP.

36. The IEP provided that the Student would receive special education in the nature of "direct instruction in appropriate social/behavioral strategies & options" for 60 minutes

daily, and that there would be "monitoring of behavioral progress" for two 15-minute periods daily. This is identical to the special education specified by the prior IEP, except that the direct instruction periods were 30 minutes longer in the new IEP.

37. The IEP provided that the Student would receive related services of "counseling" 30 minutes per month, occupational therapy of one hour each trimester, and "autism resource" one time per week for the first six weeks and one time per month thereafter. No related services had been specified in the preceding IEP.

38. The IEP identified numerous "supplemental aids and services," including "be allowed to go to a safe/calming area to gain control/composure," "support transitions between classes," "offer sensory breaks on a scheduled and as needed basis," "offer a quiet lunch area," be given foreshadowing of transitions or changes in schedules," be provided a calculator for math, "provide alternate, distraction reduced area to take tests if needed," "be allowed to type, record or give oral answers instead of writing," and "obtain a copy of class notes of peer notes." Also identified was a "transition plan" for his transition to NHS that included 21 specific measures designed to orient the Student to NHS and its routines, and the staff to the Student. Some of these measures were redundant to other "supplemental aids and services." The supplemental aids and services specified in the new IEP were considerably expanded from the scope of the supplemental aids and services that had been specified in the preceding IEP. Many of these supplemental aids and services had been discussed during the IEP team meeting.

39. The IEP included a behavior intervention plan that was substantially identical to the behavior intervention plan from the preceding IEP. During the IEP meeting, development of the behavior intervention plan had been deferred, with a view to waiting for the additional baseline information that SSOS was expected to generate, albeit at some unspecified future date.

40. The IEP exempted the Student from physical education. There had been no discussion during the IEP meeting respecting any physical education component of the IEP.

41. The IEP described the Student's "educational environment" to be "Separate Classroom (over 60% FTE in special education)." Below this entry, a box was checked that indicated the Student "will not participate full-time with non-disabled peers in regular education." This was the appropriate box to be check according to the stated design of the form, because the Student was to receive some special education services outside of the regular education classroom, apart from non-disabled peers. Below this checked box, the IEP explained:

> [The Student] will participate with non-disabled peers in a gradual sequence of class design. Sequence of regular education class participation will progress from small group to preferred regular education small class to gradually larger class with adult support through eventual independent functioning. His disability further requires direct instruction in social/behavioral options and approximately 15 minutes/2x daily to review progress (two check points). [The Student] will remove himself or be removed to a safe spot, in order to regain his composure, when stressors in the regular ed room interfere with his or others learning.

Elsewhere the IEP described the Student's educational environment as follows: "[The Student] will take typical core classes in a modified small group environment, with a gradual transition to preferred regular ed class." (Ex. 516, p. 1064). Neither description indicates whether the small group classes would be in a special education resource room or in some other type of classroom.

42. The District also prepared a formal Notice of Placement with an implementation date of May 17, 2004 at Shattuck Middle School (SMS). (The Student would have been completing his 8th grade year at SMS if had been enrolled in the District schools at the time the IEP was to be implemented.)

43. The IEP and formal notice of placement were sent to the Parents on April 30, 2004. On May 4, 2004, the Parents formally rejected the placement offer.

44. By letter dated May 6, 2004, the Parents stated that the IEP did not address their concerns, and asked that the District reconsider placement of the Student at SSOS. The Parents stated that if the District was unwilling to modify the IEP to address their concerns, that the Parents would "look for a proper placement for our son, which includes placement at [SSOS], which would also include reimbursement for the costs associated with this alternative placement." The District did not formally respond to this letter. On June 18, 2004, the Parents filed a request for a due process hearing, seeking reimbursement for the "costs of placement at [SSOS], including the costs of transportation."

45. At the time of the IEP team meeting on April 22, 2004, the information reasonably gathered did not demonstrate that the Student required extended school year services to receive a free appropriate public education.

46. The 2003-2004 IEP and placement is objectively reasonably calculated to provide the Student with a free appropriate public education in the least restrictive environment.

47. The IEP had not been substantially developed by the IEP team before the IEP determined that the placement under the yet to be developed IEP would be in the District's schools. The IEP team's determination of the placement before it had substantially developed the IEP denied the Parents meaningful participation in the IEP process.

48. Before the commencement of the IEP meeting on April 22, 2004, the District had predetermined that the placement under the IEP that had not yet been substantially

developed by the IEP team, would be in the District schools. The District's predetermination of the placement denied the Parents meaningful participation in the IEP process.

### Appropriateness and Costs of Private School Placement

49. The Student has been enrolled as a residential student at SSOS since January 2004, including through the summer months of 2004. The annual rate for tuition is established at a per diem rate of $137.80, for a total of $33,485.40, based on 243 school days per year. The annual rate for room and board is established at a per diem rate of $192.79, for a total of $70,368.35, based on a 365-day year. In January 2004, the Parents paid $100,000 to SSOS, as advance payment for tuition, room and board through approximately January 21, 2005. Tuition, room and board expenses have continued to be incurred for the period after January 21, 2005. The Parents have also paid $500 to the University of Chicago for a screening test for autism (ADOS) for which they seek reimbursement. For the period from May 2004 to May 2005, the Student would return home on weekends or have planned a weekend visit approximately 20 times, for which the Parents seek reimbursement for costs of travel for the approximate 400-mile round trip between their home and SSOS.

50. The Student has received appropriate education services at SSOS since his enrollment. The cost of tuition, room and board at SSOS is regulated by the State of Illinois and is within the range of reasonableness.

51. The Student does not require a residential placement to receive a free appropriate public education.

### Discussion

A parent of a child with a disability who has previously received special education and related services from a public school district may unilaterally enroll the child in a private school and may be reimbursed for the expenses of the private school if (1) the school district has not made a free appropriate public education available to the child in a timely manner prior to the private school enrollment, and (2) the private placement is appropriate. Wis. Stat. § 115.791; 20 U.S.C. § 1412(a)(10)(c); 34 C.F.R. § 300.403(c).

"A free appropriate public education is one 'specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction.'" *Todd v. Duneland School Corporation*, 299 F.3d 899, 905 (7th Cir. 2002), quoting *Board of Education v. Rowley*, 458 U.S. 176, 188-89 (1982). A school district, however, is not required to provide the "best possible education, or the placement that the parents prefer." *Heather S. v. Wisconsin*, 125 F.3d 1045, 1057 (7th Cir. 1997).

An IEP must "contain a specific statement of the child's current performance levels, the child's short term and long-term goals, the educational and other services to be provided, and the criteria for evaluating the child's progress." *Knable ex. Rel. Knabel v.*

*Bexley City Sch. Dist*, 238 F.3d 755, 763 (6th Cir. 2001); Wis. Stat. § 115.787(2); 20 U.S.C. § 1401(a)(20); 34 C.F.R. § 300.347(a).

For a child with a disability whose behavior impedes his learning or that of others, an IEP team must "consider, when appropriate, strategies, including positive behavioral interventions, and supports to address that behavior." Wis. Stat. § 115.787(3)(b)1; 34 C.F.R. § 300.346(a)(2)(i).

An IEP must "take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated." *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir. 1990).

The determination whether a school district has made a free appropriate public education (FAPE) available involves two basic issues: (1) whether the school district has complied with the special education law's administrative procedures; and (2) whether the school district has developed an IEP reasonably calculated to provide some meaningful educational benefit to the child. *Rowley.*

A. ABSENCE OF SSOS REPRESENTATIVE AT IEP MEETING.

The Parents contend that the IEP team meeting of April 22, 2005 was procedurally inadequate because the District did not include in the IEP team one of the Student's current teachers.

A school district is required to insure that a representative of a private school, in which a child is then receiving educational services, attend or participate in IEP meetings only if the *school district* has placed the child in the private school. 34 C.F.R. § 300.349. There is no corresponding requirement that a school district insure the attendance or participation of a representative of a private school in which a *parent* has unilaterally placed a child with a disability. The District was not required to include a representative or teacher from SSOS in the IEP team.

The District recognized, however, that the Parents might wish to arrange for the participation of representatives of the SSOS at the IEP meeting, and offered the Parents four separate dates for the meeting in a reasonable effort to allow the Parents to arrange for their participation. The Parents reported that representatives of the SSOS would not be attending the IEP meeting, either in person or by telephone, and did not request that the meeting be rescheduled to any alternate date to permit them to participate.

The District demonstrated a keen interest in obtaining all the relevant information that it could from SSOS. There were frequent comments during the IEP meeting that receipt of additional baseline information that SSOS was expected to provide at some later date would be very useful in the development of the IEP. The absence of SSOS personnel at the IEP team meeting and the absence of the additional expected baseline information from SSOS were not matters within the District's control. The District acted reasonably in

striving to accommodate efforts by the Parents to have SSOS representatives participate in the IEP meeting, and it is not at fault for the absence of SSOS staff or teachers at the IEP meeting. The District is also not at fault for the absence of additional baseline information from SSOS at the IEP meeting, and acted reasonably in developing the IEP without it.

## B. IDENTIFICATION OF THE STUDENT'S DISABILITIES AND RESULTANT NEEDS

The Parents assert that the District failed to fully identify the Student's disabilities and failed to address all the Student's educational and social emotional needs resulting from those disabilities for the 2004-2005 school year.

The District's reevaluation determined that the Student met the educational criteria of autism and other health impaired. The evaluation considered the various historical diagnoses and assessments of medical and educational professionals in determining how the Student's disabilities affected his educational performance. The diversity of opinions and conclusions respecting the identification or "label" of the Student's specific disorders is somewhat striking. (*See, e.g.,* Ex.509, pp. 1024, 1040). Perhaps the most apt description of the Student's disabilities is that provided in August 2003 by Dr. Inglese that the Student "is a child with a complex neuropsychiatric disturbance that compromises his ability to self regulate his attention and concentration, suppress irrelevant perseverance ideation and to defuse and divert antisocial/inappropriate impulses." The most operative term in this description is "complex." With medical professionals demonstrating difficulty in pinpointing the Student's disorders, it is hardly reasonable to expect the District to do better in determining the predominant or existing medical disorders.

It is striking also that the various diagnoses and assessments are largely consistent in identifying the behavioral manifestations of whatever disorders or disabilities the clinician or educator identified.

The evaluation team did a reasonable job of considering and synthesizing this wealth of information in its evaluation of the Student, and arriving at the conclusion that the Student met the educational criteria for autism and other health impairment. The IEP team also did a reasonable job of identifying the behaviors that were manifestations of his disabilities that needed to be addressed in the IEP.

The Parents contend that it was important for the District to identify the specific disorders under which the District arrived at the determination that the Student met the OHI criterion, in order for the District to develop an IEP that fit the needs of a child with such disorders. The District certainly could have engaged in this exercise, but I am not persuaded that it was required to do so or that if it had done so that it would have facilitated the development of a more appropriate IEP. The IEP team was well oriented to the various diagnoses and educational assessments of the Student, the Student's behaviors, and triggers for those behaviors. This included awareness and recognition of historical

diagnoses of OCD. There were special educators on the IEP team with training and expertise in providing educational services to children with OCD. The evidence fails to establish that the IEP team failed to take into account the Student's OCD behaviors, or any other historically diagnosed disorder, in the IEP process.

## C. PARENTAL PARTICIPATION IN DEVELOPMENT OF GOALS AND OBJECTIVES, AND PLACEMENT DETERMINATION

### 1. General.

Parental participation in the special education of their children is a hallmark of the special education laws. In *Board of Education v. Rowley*, 456 U.S. 176, 205-06 (1982), the Court commented on the "elaborate and highly specific procedural safeguards" in the law:

> It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process … as it did upon the measurement of the resulting IEP against a substantive standard. We think that the congressional emphasis upon full participation of concerned parties throughout the development of the IEP … demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.

Procedural flaws may support a finding of a denial of a free appropriate public education if they result in the loss of educational opportunity. *Heather S. v. State of Wisconsin*, 125 F.3d 1045, 1059 (7th Cir. 1997). Procedural flaws that infringe on meaningful parental participation may be deemed to result in the loss of educational opportunity and the resulting denial of FAPE, even where the resulting IEP is determined to be substantively appropriate. *See, e.g., Pitchford ex rel. M. v. Salem-Keizer School District*, 155 F.Supp.2d 1213 (D.Or.,2001); *cf. Evanston Community Consolidated School District v. Michael M*, 356 F.3d 798, 804 (7th Cir. 2004)(concluding that parents were not denied meaningful participation); *Hoffman v. East Troy Community School*, 38 F.Supp.2d 750, 761 (E.D. Wis. 1999)(observing that procedural violations "not having to do with parental involvement in the evaluation and IEP process … must imperil the substantive goals" of IDEA to establish a basis for a reimbursement claim).

### 2. Annual Goals and Short Term Objectives.

The IEP is the centerpiece of the IDEA's education delivery system. *Honig v. Doe*, 484 U.S. 305, 311 (1988). An essential component of the IEP are measurable annual goals and supporting short term objectives that meet the child's needs that result from the disability to enable the child to be involved in and progress in the general curriculum. Wis. Stat. § 115.787(2)(b); 34 C.F.R. § 300.347(a)(2).

The IEP itself was prepared in full after the completion of the IEP team meeting on April 22, 2005. The law does not prohibit this practice, and the record establishes that it is not uncommon to do so. If the requirement were otherwise, many IEP meetings would be unduly prolonged with no resulting benefit. "It is permissible for one person to draft the IEP as long as the parents are not denied the opportunity to participate, and the members of the IEP team have an opportunity to discuss and amend the IEP." *Hampton School Dist. v. Dobrowolski*, 976 F.2d 48, 54 (1st Cir. 1992).

At the April 22, 2004, IEP meeting, however, only one of the four goals specified in the IEP was specifically discussed, and the remaining three were not. There having been discussion of only one specific goal at the meeting, it is evident that the drafters of the IEP were left to devise their own, without the input of the other members of the IEP team, including most significantly, the Parents.

With respect to the short term objectives that supported the four annual goals, none were discussed or formulated at the IEP meeting. The short term objectives in the IEP are in very large part the same short term objectives that were contained in the preceding IEP. As with the formulation of the annual goals, it is similarly evident that drafters of the IEP were left to devise the short term objectives without assistance from the IEP team, again, most significantly the Parents.

The conclusion is inescapable that the drafters of the IEP, knowing that the placement determination was for a small group setting in the District schools, endeavored to craft goals and short term objectives that fit this placement determination.

When the District tendered the IEP and formal offer of placement to the Parents, it did not offer to reconvene the IEP team for it to discuss the appropriateness of the annual goals and short term objectives, as it should have, given that almost none were discussed during the IEP meeting. It was not incumbent on the Parents to request another IEP meeting to consider these matters. Rather, it was the obligation of the District to recognize the procedural flaw, and offer the Parents the opportunity to participate meaningfully in the development of the annual goals and objectives, and thereafter to discuss placement under the IEP as then appropriately developed. The District's formulation of the goals and objectives wholly outside the IEP team meeting, without the Parents participating, denied the Parent meaningful participation in development of this essential component of the IEP, and constitutes a denial of a free appropriate public education.

3. Placement Determination

The discussion at the IEP meeting respecting a placement determination centered on the District's idea that it could provide the Student with instruction in core subjects in a small group environment with regular education students. The District determined this to be the appropriate placement for the Student, even though the annual goals and supporting short term objectives that largely define an IEP had not been formulated.

The District refused the Parent's frequent entreaties to consider SSOS as an appropriate placement, stating that it would be premature to do so unless the IEP team had first determined that the IEP could not be appropriately implemented in the District's schools.

School districts must enter IEP team meetings with "open minds, not a required course of action." *Deal v. Hamilton County Bd. of Ed.*, 392 F.3d 840, 858 (6th Cir. 2004), quoting *Ms. C. ex rel. N.L. v. Knox County Schools*, 315 F.3d 688, 694-95 (6th Cir.2003).

A preponderance of the evidence, though entirely circumstantial, establishes that the District entered the IEP team meeting having made up its mind to place the Student in a small group setting in the District schools under whatever IEP was formulated.

The most compelling circumstance supporting this finding is that the District determined the placement to be in the District schools before it formulated the goals and objectives that were to be included in the IEP, as discussed above. Placement must be determined "based on the child's IEP." 34 C.F.R. § 300.552; *see also* Wis. Stat. § 115.79(2). Conceptually, it is premature to make a placement determination before an IEP is completed. Here, an essential component of the IEP (annual goals and short term objectives) had not been developed at the time the District made the placement determination. Even if the District had not truly come to the IEP team meeting with a closed mind on the appropriate placement, its action in determining placement before completion of a core component of the IEP would remain a procedural violation that denied the Parents meaningful participation in the placement determination.

Another circumstance is that the District steadfastly refused to consider the Parent's request that the District consider placement at SSOS and focused wholly on placement in the District schools in a "small group setting" with regular education students, though the contours of the "small group setting" remained largely undefined, both during the IEP meeting and in the IEP itself. The LEA Representative at the IEP meeting would permit no discussion of SSOS as a placement, even though it was apparent that the Student was continuing to struggle with his behaviors at SSOS in a small group special education setting. In view of the fact that the IEP team discussion had moved to the matter of the placement determination *before* the annual goals and short term objectives had been formulated, the Parent's request that SSOS be considered as a placement was not unreasonable, notwithstanding that SSOS is a far more restrictive educational environment than the District schools.

The District denied the Parents meaningful participation in the IEP process by predetermining that the Student would be placed in the District schools under the IEP to be developed.

Even if the District had not made such a predetermination, it denied the Parents meaningful participation by determining the placement before the annual goals and objectives were developed, and in refusing to consider the Parents' requested placement at

SSOS in its premature placement discussion and determination. These procedural flaws constitute a denial of a free appropriate public education.

### D. PROCEDURAL ADEQUACY OF DISTRICT'S NOTICE OF PLACEMENT

The special education laws require school districts to provide prior written notice to parents in a number of instances, including when a school district refuses to change the educational placement of a child. The content of the notice must include an explanation of why the district refused to take the action. Wis. Stat. § 115.792(2); 34 C.F.R. § 300.503.

The Parents complain that the formal offer of placement was procedurally deficient because it did not explain why the District refused to consider SSOS as an appropriate placement. The Parents are correct that the formal Notice of Placement did not explain why the District had refused to change the Student's placement as the Parents had requested. This procedural flaw was a mere technical violation. The Parents understood from the discussion at the IEP meeting that the District did not consider SSOS as a placement for the Student because it had determined that the IEP could be implemented in the less restrictive environment of the District schools.

### E. SUBSTANTIVE APPROPRIATENESS OF IEP

1. General.

In *Alex R. v. Forrestville Valley Community Unit Sch. Dist.*, 375 F.3d 603 (7th Cir. 2004), the court described the standards governing consideration of the substantive appropriateness of an IEP:

> Under the IDEA, local educators enjoy latitude in developing the IEP most appropriate for a disabled student and may apply their professional judgment. An IEP passes muster provided that it is "reasonably calculated to enable the child to receive educational benefits" or, in other words, when it is "likely to produce progress, not regression or trivial educational advancement." The requisite degree of reasonable, likely progress varies, depending on the student's abilities. Under *Rowley*, "while one might demand only minimal results in the case of the most severely handicapped children, such results would be insufficient in the case of other children." Objective factors, such as regular advancement from grade to grade, and achievement of passing grades, usually show satisfactory progress. Whether an IEP was "reasonably calculated to enable the child to receive educational benefits" is a question of fact ....

(Internal citations omitted).

An IEP must "take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated." *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir. 1990). Thus, the appropriateness of the IEP may not be evaluated with the benefit of hindsight, but by circumstances as they existed at the time the IEP was developed.

2. Present Levels of Educational Performance.

The Parents complain that the present levels of educational performance in the IEP
are deficient, in that many do not reflect the level of the Student's performance in relation
to the annual goals and objectives. For example, for the annual goal to demonstrate
appropriate hand raising procedures 5 out of 10 times, there is no statement in the IEP of
the frequency with which the Student presently demonstrated appropriate hand raising
procedures.

The District acted reasonably in identifying the Student's present levels of
performance in the behavioral areas addressed in the goals and objectives. There is no
contention that the Student was not presently performing at the levels set by the goals. The
absence of current data was attributable largely to the fact that the Student had not been
attending the District schools for almost a year at the time of the IEP meeting. The District
proceeded reasonably in visiting SSOS to observe the Student and to gain information
from the staff at SSOS regarding the Student's current performance. Their observations
and the information supplied by the staff at SSOS indicated that while the Student had
begun to make progress behaviorally, he continued to be plagued by the same behavioral
problems that existed before he was taken out of the district schools. To the extent that the
present levels of performance in the IEP led to development of goals and objectives that
were inappropriately high or low, this would have become evident as the IEP was being
implemented, and the goals and objectives adjusted accordingly. The absence of certain
baseline data in the present levels of performance was not due to a lack of diligence on the
part of the District, and would not lead to the denial of a free appropriate public education.

3. Annual Goals and Short Term Objectives.

The development of the goals and short term objectives was procedurally flawed,
as discussed above. Had the development of the goals and objectives not been
procedurally flawed, it is entirely possible, though not a certainty, that the IEP team would
have determined that different goals and objectives would have been appropriate, but this
of course is impossible to know. This notwithstanding, the information that was
reasonably available to the District respecting the Student's behavioral needs at the time
the IEP was developed was that he continued to be plagued by the problematic behaviors
that existed at the time he was withdrawn from the District schools, with some but not
major improvement. In light of this, it was not inappropriate for the IEP to contain
substantially the same goals and objectives as were contained in the preceding IEP. The
goals and objectives were reasonably related to meeting the Student's needs to enable him
to be involved in, and progress in the general curriculum. The goals and objectives were
objectively reasonable at the time the IEP was developed in April 2004.

4. Related Supports and Services; Behavioral Intervention Plan.

The behavioral intervention plan in the 2004-2005 IEP is substantially identical to the plan in the preceding IEP. This was intended by the IEP team, with a view to revisiting the plan in the future upon receipt of additional baseline information from SSOS, which the Parents had informed the District they expected SSOS to generate at some undetermined future date. The behavior intervention plan from the preceding IEP had been developed after the conduct of a functional behavioral assessment in early 2003. The staff at SSOS had provided visiting District staff with anecdotal information regarding the Student's behaviors and their antecedents, which was consistent with the information used to develop the behavior intervention plan from the preceding IEP. The behavior intervention plan, though dated, included reasonable strategies, supports and positive behavioral interventions to address the problem behaviors, and was substantively appropriate. Wis. Stat. § 115.787(3)(b); 34 C.F.R. § 300.346(a)(2)(i).

The Parents make no argument in their brief respecting any other claimed deficiencies in the "related services" and "supplementary aids and services" in the IEP, and it is not otherwise apparent from the evidence adduced at the due process hearing how these are believed to be deficient. Viewed in the context of the entire IEP, the provisions for these items in the IEP are reasonably designed to assist the Student to benefit from special education and to participate in the regular education classroom, and are substantively appropriate. Wis. Stat. §§ 115.76(15) & (16), 115.787(2)(c).

5. Physical Education.

There was no discussion during the IEP meeting regarding physical education or adaptive physical education, so there is no record why the drafters of the IEP determined to exempt the Student from physical education in the 2004-2005 IEP. This is both a procedural and substantive deficiency in the IEP, but one that could have been readily addressed and remedied in subsequent IEP meetings. The deficiency in the IEP does not in itself cause the IEP to fail to provide for meaningful educational benefit.

F. REIMBURSEMENT FOR EXPENSES OF PRIVATE SCHOOL PLACEMENT.

The prerequisites for reimbursement of the costs of the Parents unilateral private school placement have been established, the most critical being the denial of a free appropriate public education. Wis. Stat. § 115.791; 34 C.F.R. § 300.403(c). Tuition reimbursement is an equitable remedy. *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15-16 (1993). Reimbursement may be denied or reduced if it is determined that the actions of the parents were unreasonable. Wis. Stat. § 115.791; 34 C.F.R. § 300.403(c). Consideration of the reasonableness of a parent's action may include assessing whether the cost of the private education was reasonable. *Florence County*, at 16.

The IEP that the District developed, though procedurally flawed, was substantively appropriate. If implemented as constructed in a true small group setting for instruction in core subjects with regular education students, along with daily direct instruction in social skills, the IEP is reasonably designed to provide a free appropriate public education in the least restrictive environment.

The Student's mother tellingly testified at the due process hearing that she did not believe the Student required a residential placement, and suggested that the Parents chose to enroll the Student in the residential program at SSOS because he could not be enrolled in a day program there due to its considerable distance from their home. (Tr. 1/12/05, p. 129). Regardless whether she misspoke or said what she truly believed at the time, I am not convinced that there were no suitable non-residential private schools within commuting distance of his home that could not provide appropriate educational services. While the Student undoubtedly reaps benefits from the academic and residential programs at SSOS, the evidence is insufficient to establish that a residential program is necessary to provide him an appropriate education.

I conclude therefore that the reasonable costs of the private placement at SSOS are for tuition reimbursement for the period of the ordinary school year. See *Lascari v. Bd. of Education*, 116 N.J. 30, 560 A.2d 1180 (1989). The cost of year round tuition at SSOS is $33,485.40. Since extended school year services were not shown to have been necessary for the summer period in 2004, a reasonable reduction of the tuition reimbursement is 20%. Accordingly, the Parents are entitled to tuition reimbursement of 80% of the tuition costs at SSOS, in the sum of $26,788.32.

## Conclusions of Law

1. The District failed to offer a free appropriate public education under the IEP for the period May 17, 2004 to May 16, 2005.

2. The Parent's private placement of the Student at Sonia Shankman Orthogenic School was appropriate. The Parents are entitled to reimbursement of the reasonable expenses of their unilateral private placement of the Student for the period covered by the IEP that was proposed to be implemented on May 17, 2004. Wis. Stat. § 115.791; 20 U.S.C. § 1412(a)(10)(c); 34 C.F.R. § 300.403(c).

## ORDER

The District shall reimburse the Parents $26,788.32 for the costs of the private placement at Sonia Shankman Orthogenic School for the period from May 17, 2004 to May 16, 2005.

Dated at Milwaukee, Wisconsin on May 6, 2005.

> STATE OF WISCONSIN
> DIVISION OF HEARINGS AND APPEALS
> 819 N. 6th Street, Room 92
> Milwaukee, Wisconsin 53203-1685
> Telephone: (414) 258-6736

By: _____
     William S. Coleman, Jr.
     Administrative Law Judge

**NOTICE OF APPEAL RIGHTS**

APPEAL TO COURT: Within 45 days after the decision of the administrative law judge has been issued, either party may appeal the decision to the circuit court for the county in which the child resides under Wis. Stat. §115.80(7), or to federal district court pursuant to 20 U.S.C. §1415 and 34 C.F.R. §300.512. A copy of the appeal should also be sent to the Division of Hearings and Appeals, 5005 University Avenue, Suite 201, Madison, WI 53705-5400. **The Division of Hearings and Appeals will prepare and file the record with the court only upon receipt of a copy of the appeal.**